**In re Philip R. SWAN, aka Phillip R. Swan, Debtor.**

**Monique MOODIE–YANNOTTI, Plaintiff,**

**v.**

**Philip R. SWAN, Defendant.**

**Bankruptcy No. 3–92–2958.**

**No. ADV 3–92–183.**

United States Bankruptcy Court, D. Minnesota, Third Division.

July 14, 1993.

William R. Skolnick, Minneapolis, MN, for plaintiff.

Jeffrey S. Ronbeck, Gary A. Flatten, Minneapolis, MN, for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, IN PART

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court on January 19, 1993, for hearing on the Plaintiff's motion for summary judgment. The Plaintiff appeared by her attorney, William R. Skolnick. The Defendant appeared by his attorneys, Jeffrey S. Ronbeck and Gary A. Flatten. Upon the moving and responsive documents, the pre- and post-hearing briefs of counsel, and the argument made at the hearing, the Court makes the following order.

This motion presents an unusual variant of the application of collateral estoppel in dischargeability proceedings. In 1990, the Plaintiff sued the Defendant and one Richard W. Greeman in the Minnesota State District Court for the Fourth Judicial District, Hennepin County. The gravamen of her complaint was that the named defendants had caused financial injury to her by inducing her to invest approximately $450,-000.00 in the American Jewelry Guild ("the AJG"), a "multi-level marketing organization," in April 1987 and thereafter. As against the Defendant, the complaint sounded in common-law fraud and under the Minnesota state securities laws. As against Greeman, the complaint sounded under the same theories, plus negligence (legal. malpractice.)[1]

On January 13, 1992, the parties commenced trial before a jury, Judge Bruce

---

1. Greemann had been the corporate counsel of the AJG, as well as a shareholder, officer, and director. The Plaintiff apparently pled that Greeman had acted as her personal attorney in services he rendered in connection with her purchase of AJG stock and her later investment in the company, and, accordingly, had owed a duty of care to her individually.

Hartigan of the state District Court presiding. The trial lasted almost ten days. In submitting the case to the jury, Judge Hartigan instructed it that the Plaintiff had to prove her case on all three counts by a fair preponderance of the evidence. On January 23, 1992, the jury rendered a verdict in favor of the Plaintiff on all three counts. It awarded her damages of $500,000.00 against both defendants on the common-law fraud count; $330,000.00 against Greeman on the legal malpractice count; and a total of $500,000.00 against both defendants on the securities count, apportioned between the two of them in specific awards.

Judge Hartigan had submitted the case to the jury on a special verdict form. In rendering its verdict, the jury answered all of the interrogatories on the form favorably to the Plaintiff. Specifically, it found that:

1. On or before April 23, 1987, the Defendant had made a false representation of a past or present material fact to her;

2. The Defendant and Greeman had acted jointly or in concert to conspire with each other in making material false representations to her;

3. The Plaintiff had acted in reliance on the false representations made by both defendants, or they had made the representations under circumstances where she was justified in relying upon them;

4. The sum of $500,000.00 would fairly compensate the Plaintiff for damages that were a direct result of the false representations;

5. Both defendants had made "an untrue statement" of a material fact in connection with the Plaintiff's purchase of stock in the AJG in transactions that took place on April 23, 1987; and

6. The sum of $500,000.00 would adequately compensate the Plaintiff for damages directly caused by the statement(s) made in connection with the sale of the securities, of which $170,-

000.00 was apportioned to the Defendant.

On February 3, 1993, Judge Hartigan entered Findings of Fact, Conclusions of Law, and an Order for Judgment based on the jury's verdict. In pertinent part, he noted in the findings and conclusions that Greeman and the Defendant had

... acted jointly, in concert, to conspire to engage in and did commit fraud and misrepresentation against ...

the Plaintiff. Both of the defendants made timely post-trial motions. Entry of judgment was stayed pursuant to Minnesota statute and rule, and then pursuant to an order entered on February 21, 1993. Via an order entered on March 19, 1992, Judge Hartigan denied the defendants' motions for judgment notwithstanding the verdict; granted their motions for new trial on the common-law fraud count of the Plaintiff's complaint; and denied their motions for new trial as to the other two counts. Via an amended order entered on April 2, 1992, he modified the order for judgment to comport with these rulings. As part of these modifications, he vacated those terms of the original order for judgment that had granted judgment on the common-law fraud count. He also amended the order's terms that had granted judgment on the other two counts.

Judge Hartigan had entered a memorandum in connection with the March 19, 1992 order, which he specifically incorporated into the amended order of April 2, 1992. In it, he held that the evidence justified the jury's findings as to all of the elements of common-law fraud, as well as those of a violation of the Minnesota securities laws. Since there was competent evidence of record that reasonably tended to sustain the verdict, then, he denied the defendants' motions for judgment notwithstanding the verdict.

Apparently the defendants' chief argument in their motions for a new trial went to the quantum of proof required of the Plaintiff. The memorandum contains a lengthy and thoughtful discussion of the extant decisions of the Minnesota appellate courts on the issue of the plaintiff's burden

of proof in a fraud action under Minnesota common law. Judge Hartigan noted that recent decisions of the Minnesota Supreme Court and the Minnesota Court of Appeals had alternated between requiring proof by clear and convincing evidence, and proof by a preponderance of the evidence. He then noted that the Minnesota Supreme Court had never affirmatively overruled past decisions applying the lesser burden, but that its last pronouncement on the issue, *Weise v. Red Owl Stores, Inc.*, 286 Minn. 199, 175 N.W.2d 184 (1970), had imposed the heightened standard of proof. Feeling compelled to apply the last ruling by the highest state court, particularly in light of later opinions by the Minnesota Court of Appeals, he concluded that his jury instruction was erroneous to such a degree that a new trial on the fraud count was mandated. Noting that the lesser burden of proof unquestionably applied to the securities-law count, he denied the motion as to that part of the verdict and order for judgment.

On April 29, 1992, the clerk of the Hennepin County District Court finally entered a money judgment against the Defendant and Greeman, which conformed to the jury's verdict on the securities-law and malpractice counts. The judgment itself contained a proviso that incorporated Judge Hartigan's March 19, 1992 memorandum.

Before a second trial on the fraud count could be convened, however, the Defendant filed a voluntary petition for relief under Chapter 7 in this Court on May 20, 1992. This, of course, interposed the automatic stay of 11 U.S.C. § 362(a)(1) against any further action by the Plaintiff against the Defendant.[2]

The Plaintiff timely filed her complaint in this adversary proceeding. She seeks a determination that the Defendant's debt to her is excepted from discharge by operation of 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and 523(a)(6).[3] She now moves for summary judgment pursuant to FED.R.BANKR.P. 7056,[4] on her counts sounding under 11 U.S.C. §§ 523(a)(2)(A)—(B), the "actual fraud" and "false financial statement" theories. To establish the lack of triable fact disputes that Rule 56 requires, she relies exclusively on the doctrine of collateral estoppel, also known as "issue preclusion." She argues that the Defendant is bound by all of the findings of fact made by the jury in the state-court lawsuit, whether they ultimately were merged into the order for judgment or not, and that he is precluded from relitigating

---

**2.** The Plaintiff and Greeman have since resolved all disputes between them and the Plaintiff apparently has given him a satisfaction and release. A third party involved in the Plaintiff's purchase of AJG stock filed for bankruptcy and received a discharge, apparently before she commenced suit in the state court. The Defendant, then, is the only participant in the subject transaction whose liability to the Plaintiff is still at issue.

**3.** These statutes provide:

A discharge under section 727 ... of [the Bankruptcy Code] does not discharge an individual from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive ...

. . . . .

(4) for fraud and defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [and]

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...

**4.** This Bankruptcy Rule incorporates FED. R.CIV.P. 56, and makes applicable to adversary proceedings. FED.R.CIV.P. 56(c) provides that, upon a motion for summary judgment,

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

these issues for the purposes of this adversary proceeding.

■ The proponent of collateral estoppel under these circumstances must demonstrate the existence of four elements:

1. The fact issue to which the doctrine is to be applied must be the same as one involved in the prior court proceeding;

2. The issue must have been actually litigated in the prior proceeding;

3. The issue must have been determined by a valid and final judgment; and

4. The adjudication of fact must have been essential to the prior decision.

*In re Miera*, 926 F.2d 741, 743 (8th Cir. 1991); *Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir.1983). The Supreme Court recently affirmed that collateral estoppel does lie in dischargeability proceedings under 11 U.S.C. § 523(a). *Grogan v. Garner*, 498 U.S. 279, 284–285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991). Thus, where the elements of a state-law cause of action for fraud are identical to the elements of an exception to discharge under § 523(a)(2), 498 U.S. at 285, 111 S.Ct. at 658, collateral estoppel may be applied to except previously-litigated fraud claims from discharge without retrial in the Bankruptcy Court, 498 U.S. at 290, 111 S.Ct. at 661.

As it turns out, this motion actually raises two very different questions as to the applicability of collateral estoppel.

The first is joined by the theory that the Plaintiff relies on more heavily: that the jury's verdict on her securities-law claim, which was reduced to judgment, covered all of the fact issues germane to the elements of § 523(a)(2)(A) and, therefore, can trigger collateral estoppel. This theory does not prevail—while, indeed, the Plaintiff got a final judgment entered on this claim, the state-court record does not establish that

that prior adjudication incorporated findings on all elements of § 523(a)(2)(A).

■ To have a debt excepted from discharge under that section, the complaining creditor must show, among other things, that the debtor made false representations of past or present fact to the creditor, with fraudulent intent—i.e., with the conscious goal of inducing the creditor to grant credit or to otherwise give money, property, or services, in reliance in the misrepresentations. It must also show that it actually relied on the misrepresentation in deciding to close the transaction with the debtor. *See In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987) and *In re Ophaug*, 827 F.2d 340, 343 (8th Cir.1987), as well as the general discussion in *In re Gibson*, 149 B.R. 562, 568–569 (Bankr.D.Minn.1993). Minnesota law [5]

> requires the party asserting [collateral estoppel] to establish that the precise question was in fact presented *and necessarily determined* by the verdict in the former trial.

*Sachs v. Jenista*, 296 Minn. 535, 210 N.W.2d 45, 46–47 (1973) (emphasis added). Here, only some of the jury's answers to special interrogatories survived the post-trial motions and were merged into the securities-law judgment. The surviving answers do not speak to the issue of intent at all; they only go to the ultimate facts that established liability under the Minnesota securities laws. As the Defendant points out, those laws permit recovery for negligently-made misrepresentations made in connection with sales of securities, as well as intentionally-made ones. *E.g., Sprangers v. Interactive Technologies, Inc.*, 394 N.W.2d 498, 503 (Minn.Ct.App.1986). Where the state substantive law governing a fraud-based nonbankruptcy cause of action allows recovery for negligent as well as intentional misrepresentations, a general

---

**5.** State law provides the governing rules for the application of collateral estoppel in the federal courts, where state substantive law governed the original determination. *See Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982); *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 188, 61 S.Ct. 513, 515, 85 L.Ed. 725 (1940);

*Tolefree v. City of Kansas City*, 980 F.2d 1171, 1173–1174 (8th Cir.1992); *Butler v. City of N. Little Rock*, 980 F.2d 501, 503 (8th Cir.1992); *Lane v. Sullivan*, 900 F.2d 1247, 1250 (8th Cir. 1990) (all holding that federal courts must give same preclusive effect to state-court decisions that those decisions would be given in courts of state of their origin).

state-court verdict, findings that are voiced in the alternative between the two states of mind, or findings that are silent as to the defendant's intent do not constitute a specific finding of *intentional* misrepresentation. As a result, they do not trigger collateral estoppel in a dischargeability proceeding based on § 523(a)(2). *Schwartz v. Renville Farmers Co-op Credit Union*, 44 B.R. 266, 268–269 (D.Minn.1984); *In re Carothers*, 22 B.R. 114, 119–120 (Bankr. D.Minn.1982). The few specific findings that underlay the securities-law judgment do not address the issue of the Defendant's intent at all, let alone with the specificity required for the application of collateral estoppel. The extant judgment, then, does not bar the Defendant's relitigation of the issues of his intent and the Plaintiff's reliance.

This leaves the second question, one raised and argued by the Plaintiff in the alternative. That one is whether the jury's findings on the Plaintiff's common-law fraud claim, and the conclusions as to them that Judge Hartigan made in ruling on the post-trial motions, can trigger collateral estoppel to bar the Defendant's relitigation of the fact issues that are common to the state-law cause of action and the statutory basis for nondischargeability invoked here.

As to this alternate theory, only one of the elements of collateral estoppel is in controversy: whether the fact issues in question were settled by a court decision with the requisite finality. The Defendant does not deny that, in its answers to the special interrogatories on the fraud count,

the jury found facts sufficient to satisfy all elements of § 523(a)(2)(A).[6] He also does not deny that these specific fact elements were put into suit and litigated, or that they were essential to the original verdict. The Plaintiff chose to posture her complaint in terms of actual fraud, as was her right, and pursued and obtained judgment under that theory. This is sufficient to establish the essentiality requirement. *In re Gibson*, 149 B.R. at 576–577.

The Defendant maintains, however, that an application of collateral estoppel upon the results of the proceedings on the Plaintiff's common-law fraud claim would be improper. As his counsel correctly notes, the state court has never entered judgment against his client on that claim. Thus, he argues, the Plaintiff lacks a prior, final judgment that incorporates the specific findings that otherwise would trigger collateral estoppel as to the issue of his intent, as well as that of the Defendant's reliance.[7]

The question, then, is whether the Plaintiff may rely on the state-court jury's decision on her fraud claim to establish, as undisputed facts, the elements of intent, scienter, and reliance. In terms of the theory of collateral estoppel, the issue is whether the verdict on her common-law fraud claim should be deemed the equivalent of a final judgment, and accorded preclusive effect here, even though the Defendant's motion for new trial was granted.

In Minnesota, the general rule is that a court's finding of fact or a jury's verdict, standing alone, does not have pre-

---

6. He would have been hard-pressed to deny this anyway; as noted in the discussion in *In re Gibson*, 149 B.R. at 568–569, the core elements of intentional fraud under Minnesota common law are identical to those of § 523(a)(2)(A). Minnesota law, of course, allows recovery for negligently-made misrepresentations as well as fraudulent statements made intentionally. *Schwartz v. Renville Farmers Co-op Credit Union*, 44 B.R. at 268. However, in his Conclusions of Law, Judge Hartigan held that the jury's findings satisfied the requirements of *both* "fraud" and "misrepresentation." The intent element of § 523(a)(2)(A) does not require a finding of malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question. *In re Hunter*, 771 F.2d 1126,

1129 (8th Cir.1985); *In re Gibson*, 149 B.R. at 572. This, certainly, is satisfied by the same sort of proof that meets the intent element of common-law fraud under Minnesota law. A finding of actual intent on the part of the Defendant, to induce the Plaintiff to rely on his misrepresentations, is inherent in the jury's findings, the judge's conclusions, and their interplay. *Compare In re Miera*, 104 B.R. 150, 159 (Bankr.D.Minn.1989), *as aff'd at* 926 F.2d at 744–745.

7. Though he insists that he is not even precluded on the issue of whether he even made a false statement, he is wrong; the securities-law judgment is based on this finding and properly raises the bar for that element.

clusive effect in a later action between the same parties and on the same subject matter. *State v. Brooks–Scanlon Lumber Co.*, 137 Minn. 71, 162 N.W. 1054 (1917). Only the entry of judgment can constitute a final adjudication which triggers the bar of collateral estoppel. *Miller v. Simons*, 239 Minn. 523, 59 N.W.2d 837, 839 (1953); *Mitchell v. Bazille*, 216 Minn. 368, 13 N.W.2d 20, 25 (1944). *See also Smith v. Smith*, 235 Minn. 412, 51 N.W.2d 276, 279 (1952); *State v. Brooks–Scanlon Lumber Co.*, 162 N.W. at 1054. Though the rationale behind this rule is not explicitly or concisely set out in the cases, it can be gleaned from several observations:

A finding of fact is not an adjudication; it is the judgment which is the adjudication.

*Stevens v. Mpls. Fire Dept. Relief Ass'n*, 219 Minn. 276, 17 N.W.2d 642, 646 (1945) (citing *Mitchell v. Bazille* ); and

... there must be proof of the *finality* of the adjudication in order to constitute an estoppel and ordinarily a verdict is not such an adjudication since it may be set aside upon a motion for a new trial or upon a motion for judgment notwithstanding the verdict.

*Miller v. Simons*, 59 N.W.2d at 839 (emphasis added).

The Minnesota courts have recognized several equitable exceptions to this general precept, to mitigate the harshness of a strict, technical application in appropriate cases. Thus, they have concluded that a party may be "estopped by verdict" [8] where it agrees with its opposing party to treat the verdict as final, accepts consideration in the amount which it otherwise would have been entitled to reduce to judgment, and stipulates to dismissal with prejudice before the formal entry of judgment. *Miller v. Simons*, 59 N.W.2d at 840. They have also recognized that a party may be estopped by a verdict where it has ac-

quiesced to it in such a fashion that formal entry of judgment in the earlier action was not necessary. *Ellis v. Mpls. Comm'n on Civil Rights*, 319 N.W.2d at 704. Finally, and as a more general equitable proposition, the court may dispense with the requirement of prior formal judgment to the benefit of a party asserting collateral estoppel, where

the entry of judgment has been prevented by action of the adverse party or the court in such manner that it would be inequitable not to give to the one entitled thereto the benefit of the bar or estoppel which would attend the judgment when entered.

*Hutton v. Boucher*, 157 Minn. 40, 195 N.W. 495 (1923).

The question, then, is which, if any, of these exceptions apply here.

This is not a case for the specific exception recognized in *Miller v. Simons*. That case requires an *active* manifestation of assent to an original verdict, one which brought about an accord and satisfaction, in order to estop the party so assenting. The Defendant simply did not do that, in the overt and unmistakable fashion that the case requires.

The court in *Ellis*, however, recognized that a party's more passive acquiescence to a jury verdict may estop it from demanding that its opponent meet the final judgment requirement. There, a party who had raised a claim of racial discrimination in a landlord's termination of tenancy had unsuccessfully tried the issue to a jury in the landlord's unlawful detainer proceeding. After the return of the verdict but before entry of judgment and issuance of a writ of restitution, the tenant voluntarily moved out of the premises at issue. The Minnesota Supreme Court held that, notwithstanding the lack of formal judgment, the jury's finding of lack of discrimination could collaterally estop the tenant in his later civil

8. In several instances in *dicta,* the Minnesota Supreme Court has said that "estoppel by verdict" and "collateral estoppel" are different terms for the same concept. *E.g., Ellis v. Mpls. Comm'n on Civil Rights,* 319 N.W.2d 702, 703 n. 3 (Minn.1982); *Howe v. Nelson,* 271 Minn. 296, 135 N.W.2d 687, 691 (1965). It would seem more accurate to distinguish them, with "collateral estoppel" as signifying the broader concept requiring final judgment and "estoppel by verdict" as denoting the same principle, as modified by an equitable exception to the requirement of final verdict.

rights proceeding against the landlord, because he had acquiesced in the verdict and the time for relief from the verdict had passed. 319 N.W.2d at 704.

■ Though manifested differently, and somewhat more difficult of ascertainment because of the more complicated procedural history, a comparable acquiescence took place here. The Defendant could have set aside his argument on the burden of proof rather than raising it in his post-trial motion; he then could have contested the sufficiency of the evidence to meet the charged burden of proof, by taking an appeal from the order denying his motion for judgment notwithstanding the verdict. He did not do so. He took no exception, formal or informal, to Judge Hartigan's ruling on the sufficiency of the evidence. This constituted a passive acquiescence to that ruling, and all it portended for the soundness of the jury's verdict as far as its support in the evidence—*under the same standard that was to be applied in this adversary proceeding.*[9] Having then elected to file for bankruptcy, derailing all further proceedings in the state court, the Defendant cannot be heard to complain that there was no formal, final adjudication on the issues as to which the Plaintiff seeks to preclude him.

Even though this conclusion is dispositive, it is appropriate to examine whether this also is a case for a tailor-making of the general exception enunciated in *Hutton v. Boucher* and in *Brooks–Scanlon Lumber Co.;* the novelty of the procedural history, and its peculiar resonance with the call to equity in those cases, virtually compel it.

Applying the broad equitable exception, of course, is not something to be done lightly, particularly to the facts at bar. At this point, the jury verdict on the fraud count has been set aside. In a very real sense, applying the exception to the Plaintiff's benefit would summon the jury's decision from the metaphysical Great Beyond to which Judge Hartigan's order exiled it. More crucially, it would give binding collateral effect to the revenant verdict. Several possible objections, none of them unreasonable, come to mind. One is on an abstract philosophical plane: Was the slate not wiped clean on the fraud claim, when a new trial was granted? How can the verdict be given such real-life effect, when it was legally annulled for all further proceedings in the forum that spawned it? The other stems from concerns over federalism: would a federal court not be denying comity to the current status of the docket in the state court case, were it to consider the set-aside verdict as having continuing vitality?

In the last instance, however, the general exception is properly applied to estop the Defendant, and it leads to the fairest result. As the Eighth Circuit has noted,

> When faced with deciding what state law is without precedent to guide [them], "[the federal courts must] apply what [they] view as the optimal rule of collateral estoppel under the circumstances of th[e] case."

*Lane v. Sullivan,* 900 F.2d at 1250 (quoting *Gerrard v. Larsen,* 517 F.2d 1127, 1132 (8th Cir.1975)). This maxim allays many of the suspicions just voiced. One cannot escape the conclusion that the Minnesota state appellate courts would endorse an application of the *Hutton v. Boucher,* exception to the facts at bar. The result, certainly, would vindicate the state courts in several respects. It would acknowledge the trial court's significant investment of time and resources in the first trial, and it would see that that did not come entirely to naught. It would ensure that the Defendant's bankruptcy filing did not amount to a predatory "quick fix" for a problem with a single pressing creditor. Finally, it would prevent a party seeking to hide behind the final-adjudication requirement from exploiting a defect largely of his own making, just to impose significant extra burden on his opponent and on one or both of the federal and state court systems.

On the other hand, strictly applying the final-judgment requirement would permit Defendant to deny his opposing party every shred of benefit from a hard-won, costly adjudication in a state-court forum, after

---

9. *See Grogan v. Garner,* 498 U.S. at 291, 111   S.Ct. at 661.

he apparently had had no objection to the authority of that forum to render decision on the parties' dispute for the several years of the litigation. Too, it would create the possibility of additional delay and expense for the Plaintiff in litigating new substantive issues in a different forum. The latter, of course, would give the Defendant an unduly large, extra bargaining chip in any further settlement negotiations. The *Miller v. Simons* court envisioned just such considerations when it observed:

> The doctrine of estoppel by verdict is established in the interest of public policy. There must be an end to litigation sometime. Where a party has litigated an issue in a former action in a court of competent jurisdiction, he should not be permitted to litigate the issue again to the harassment and vexation of his opponent.

59 N.W.2d at 840.

These observations largely stem from gut-level considerations of fairness. As such, they probably do not completely satisfy the elements of the exception. In a more technical sense, however, the theory and policy behind the exception support its application to the Plaintiff's benefit. Though the Defendant was not involved in the state-court litigation by his own volition, he had full opportunity for a plenary defense, and he availed himself of that opportunity. He had every chance to convince one finder of fact that he had not committed fraud. He failed to timely command the substantive protection of an enhanced burden of proof for his opponent when the parties submitted jury instructions. Judge Hartigan found that he and his co-defendant had been "culpable" in this failure. Memorandum of March 19, 1993, at 16. After the jury held against him and his co-defendant, Judge Hartigan still gave him a reprieve by the only means available by that time, a new trial, with all it portended by way of cost, delay, and continuing uncertainty.

Rather than follow through with what he had demanded, however, the Defendant chose to seek the protection of this court. The statements and schedules in his case show that he had only one reason to even claim that protection—the likelihood of the Plaintiff taking a judgment against him after a second trial.[10] The Defendant had only one plausible motivation for filing for bankruptcy when and as he did: assuming that the state court's verdict and judgment were not given collateral effect by the Bankruptcy Court, he could not lose by doing so. In a best-case scenario, if the Plaintiff neglected to timely commence an adversary proceeding, or chose not to, he would wholly avoid liability to her once he received a discharge. At the very least, he could assert a right to a full-dress retrial before the Bankruptcy Court, and could argue all of the "debtor rehabilitation" policies of the Bankruptcy Code to his benefit. In this, he would avoid the prospect of a loss before another state-court jury—when the Plaintiff obviously had been able to muster great sympathy from one in the first trial.

The Bankruptcy Court should not countenance procedural maneuvering like this. The Defendant has dashed willy-nilly between basic theories of defense and between forums, giving the impression of engaging only in a rear-guard action that was designed to throw as many impediments in his opponent's way as possible. None of his arguments on the point at bar, however, recognize the *court's* central concerns in presiding over a dispute like this one:

---

**10.** The Plaintiff was the only unsecured creditor noted on the Defendant's original Schedule F. He scheduled no priority unsecured claims; the holders of the first and second mortgages against his homestead were his only scheduled secured creditors. He reaffirmed the debt in favor of one of these mortgagees. The Defendant may have had one other pre-petition debt, though even that is not utterly clear from the case file. After the Defendant received a discharge, his counsel sent a notice to the Minnesota Department of Jobs and Training that it "[i]nadvertently . . . was omitted from the bankruptcy petition." The court file, however, contains no information as to the nature and amount of its claim, if any, against the Defendant. The Defendant clearly filed for bankruptcy solely to try to defeat his liability to the Plaintiff. Few better examples of a "targeted bankruptcy," or of the so-called "single-creditor case," could be found in the Chapter 7 context.

preserving a level playing field for all parties; preventing the technicalities of procedure from obscuring and overwhelming substance; and applying the rules so as to ensure a process that will consume as little of the parties' and society's resources in dispute resolution as is necessary to achieve a just result. In passing on the basic fairness of strictly applying the final-judgment requirement, a court applying Minnesota law can fairly take cognizance of these latter-day preoccupations. To be sure, *Hutton v. Boucher* was decided seventy years ago—but equity must keep pace with the times.

When the respective equities are weighed with such concerns in mind, the Defendant's come up short of the Plaintiff's. The Defendant took the affirmative on his strategy; he must be held to task for any unfair manipulation or over-reaching that would result, were his choices ratified. Divining the existence or non-existence of such inequity requires some extrapolation: where would the parties have been situated, had the Defendant's procedural elections been different? Once that is determined, one goes on to the next question: would that posture embody a significantly fairer allocation of the burdens and costs of continued litigation and/or appellate review? If it would, a deviation from the requirement of a final judgment would be an appropriate exercise of equitable discretion.

Had the Defendant invoked the correct burden of proof in his required jury instructions on the fraud claim, obviously, there could have been two possible outcomes. Under either, the Defendant would have left the Plaintiff in a fairer and more tenable posture for all further litigation between the parties. Had the Defendant still lost, the path would have been clear for an appeal through the state process, after only one go-round before the jury. Even had the Defendant lost at trial and still filed for bankruptcy, the state court's process and its outcome would not have been subject to the cloud that has required

the present inquiry.[11] On the other hand, had the jury concluded that the Plaintiff had not met the higher standard of proof, the whole matter would have been brought to a close—subject, of course, to an appeal by the Plaintiff, in which the issues would have been more neatly circumscribed than they were left here. In either case, the Plaintiff would not have been put to the burden of defending post-trial motions, and would not be now facing another trial in the state court or here. More importantly for this court's role in the whole process, the Plaintiff would not be facing a greater prospect of involved litigation in this Court over the dischargeability issue; she would either have lost on the validity of the underlying debt, or could invoke collateral estoppel, simply and in a straightforward fashion, on the basis of a fraud verdict in her favor.

Strictly speaking, the circumstances do not rise to the level of an "estoppel in fact," as contemplated under *Brooks–Scanlon Lumber Co.;* in the post-verdict proceedings, the Defendant neither made overt promises or inducements, nor took any particular position, on which the Plaintiff actually and reasonably relied to her detriment. *See, e.g., Hydra–Mac, Inc. v. Onan Corp.,* 450 N.W.2d 913, 919 (Minn. 1990); *TransAmerica Ins. Group v. Paul,* 267 N.W.2d 180, 183 (Minn.1978); *In re Gibson,* 149 B.R. at 577; *In re Sunde,* 149 B.R. 552, 557–558 (Bankr.D.Minn.1992); *In re Johnson,* 139 B.R. 208, 218 (Bankr. D.Minn.1992). However, in a broader but nonetheless cognizable sense, equity should not allow the Defendant to gain from the imbroglio he created. To do so would ratify a strategy that could be construed as shopping through successive forums until one obtains a favorable result. It would, rather, be inequitable not to now give the Plaintiff the benefit of the bar of the judgment she would otherwise have obtained on her fraud claim. She has already proved up her case on fraud by the same quantum of evidence that this court would have required of her. The Defendant's dodge through bankruptcy should not be allowed

---

**11.** The same result would have obtained had the Defendant followed through with a new trial

after being granted it, without filing for bankruptcy until after the second trial was over.

to impede or prevent some final resolution of his underlying liability to her, on application of the proper burden of proof for legally fixing that liability at state law.

■ On the unique, even anomalous procedural history of this case, then, the Defendant should be bound to the Hennepin County jury's findings on the fraud issue—even though those findings were never merged into a formal judgment, and even though they technically were rendered a nullity when Judge Hartigan granted a new trial. Since those findings and Judge Hartigan's conclusions of law on them match up to the elements of a debt nondischargeable under § 523(a)(2)(A), the Plaintiff is entitled to summary judgment in her favor on the issue of the dischargeability of the Defendant's debt to her under that provision.[12]

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

1. That the Plaintiff's motion for summary judgment is granted, as to the dischargeability of the Plaintiff's fraud claims against the Defendant, and denied, as to the Plaintiff's claims against the Defendant under the Minnesota securities laws.

2. That the Defendant's debt, if any, to the Plaintiff, the subject of the lawsuit presently pending in the Minnesota State District Court for the Fourth Judicial District, Hennepin County, under the caption of *Moodie–Yannotti v. Swan, et al.*, Court File No. 90–8455, was excepted from the discharge in bankruptcy granted to the Defendant by this Court's order of August 25, 1992, in BKY 3–92–2958, by operation of 11 U.S.C. § 523(a)(2)(A).

LET JUDGMENT BE ENTERED IN ACCORDANCE WITH TERM 2 OF THIS ORDER.

---

12. This substantive disposition leaves several procedural matters hanging, but none are difficult. First, the outcome under § 523(a)(2)(A) renders superfluous any discussion of § 523(a)(2)(B). Second, in her prayer for relief for this adversary proceeding, the Plaintiff requested a money judgment. As evidenced by her counsel's remarks at oral argument, she wishes to retry the issue of the Defendant's liability for common-law fraud in the Hennepin County District Court. This Court has performed its primary function by determining dischargeability, so there is no real reason why the remaining issues need to be litigated here. By separate order, then, the Court is acting *sua sponte* to abstain pursuant to 11 U.S.C. § 1334(c)(1), from hearing and determining those issues. Third, there still is, of course, the question of the dischargeability of the Defendant's liability under the securities laws. Since the Plaintiff wishes to finish the second part of her two-step process by taking the state-court litigation back to trial, this alternate second step can be held in abeyance until she obtains judgment on her common-law claim. After the present judgment of nondischargeability becomes final and non-appealable, this Court will order that this proceeding be administratively closed, subject to reopening for further litigation on the remaining dischargeability issue, on application of the Plaintiff or the Defendant.